## ADMINISTRATIVE SERVICES AGREEMENT

This Administrative Services Agreement (the "Agreement") is entered into as of _____, 2024 by and between **Mid-Atlantic Rheumatology, LLC,** a Maryland limited liability company that is a medical practice specializing in rheumatological and other musculoskeletal disorders ("Group") and **OI Infusion Services, LLC**, a Delaware limited liability company ("OI Infusion"), under which the Parties agree that OI Infusion shall provide certain administrative and business support services as described in this Agreement and outlined in Appendix A. Group and OI Infusion shall be collectively referred to as the "Parties", or individually as a "Party".

### RECITALS

A.   Group. Group provides or arranges for the provision of in-office infusion medicine services (the "Professional Services") at 231 Najoles Road, Suite 160, Millersville, MD 21108 (the "Infusion Site") to patients through employed or contracted physicians and other medical professionals (collectively, "Providers"); and

B.   OI Infusion. OI Infusion provides certain non-clinical administrative services required by Group to operate and deliver Professional Services (the "Administrative Services" or the "Services"); and

C.   Group and OI Infusion desire to enter into this Agreement in order to set forth their respective duties and obligations in connection with the subject matter hereof.

NOW, THEREFORE, for valuable consideration, the amount, sufficiency and receipt of which are hereby acknowledged, the Parties agree as follows:

### Article 1
### Retention of Authority; OI Infusion Services

1.1   **Retention of Authority**. Nothing in this Agreement is intended to result in the delegation or any transfer of any responsibility or control of Group for the delivery of Professional Services to patients or any services for which licensure as a physician or professional is required under applicable Law. The responsibilities of Group and Providers are in no way abrogated by this Agreement. Any powers or obligations relating to the Professional Services or any other activities of Group not specifically delegated to OI Infusion under this Agreement shall remain the responsibility of Group. Group and each physician or medical professional owner, employee or contractor of Group shall retain responsibility for delivery of Professional Services to patients and establishing and overseeing the clinical policies, management and overall clinical operations of Group. Group will provide a duly licensed physician to serve as the Medical Director of the Infusion Site (the "Medical Director") to, without limitation, provide medical supervision and t o review and

oversee all Infusion Site policies and procedures.

1.2    **Performance of Administrative Services.** OI Infusion agrees to provide the Administrative Services set forth in Appendix A, in accordance with the applicable terms and conditions relating thereto and the Group's policies, procedures, and processes as they pertain to the Administrative Services.

### Article 2
### Responsibilities of Group

2.1.    **Representations and Warranties of Group.** Group hereby represents and warrants to OI Infusion, and as applicable, Group agrees, that at all times during the term of this Agreement:

2.1.1    Group is and will be a business duly organized, validly existing, and in good standing under the laws of the State of Maryland and is duly qualified under all applicable laws and regulations to engage in the practice of medicine and the provision of Professional Services in the State of Maryland.

2.1.2    Each of the Providers who are members of, employed by, or engaged by Group to render professional services on behalf of and for Group is and will be duly licensed, certified, or registered, to render the Professional Services for which he or she has been employed or engaged by Group.

2.1.3    Group will establish and enforce procedures to ensure that proper and complete patient records are maintained regarding all patients of Group as required by Section 4.3 below, applicable law and by the rules and regulations of any applicable governmental agency.

2.1.4    Group will provide suitable space at the Premises for the operation of the Center.

2.1.5    Group will provide OI Infusion with access to and use of its electronic medical records system solely to the extent necessary for the operation of the Infusion Site (subject to Section 4.2.3 below).

2.1.6    Group will provide OI Infusion with access to clearinghouse and payor portals necessary to receive electronic remittance advices and verification of payment.

2.1.7    Group will provide OI Infusion with access to one of the Group's bank accounts where funds related to infusion services provided at the Infusion Site will be transferred.

2.1.8    Group will provide copies of newly executed contracts or modifications to existing contracts, fee schedules, and/or Medicare expected rates within ten (10) business days of Group's receipt.

2.1.9    Group will provide patient insurance information, the appropriate codes for billing to the applicable payor, a copy of Explanation of Benefits (EOBs) in an electronic format (835 file) and confirmation of patient payments to OI Infusion within ten (10) business days of receipt by Group.

2.1.10    Group will approve invoices and make payments in a timely manner in accordance with Appendix B.

2.1.11    Group will provide letters of medical necessity as required.

2.1.12    Group will submit a full and complete patient list, drug mix by patient, payor mix and contracts to OI Infusion no later than fourteen (14) days after signing this Agreement.

**2.2.    Professional Services; Communications with Manufacturer; Signing Authority.**

2.2.1    During the term of this Agreement, Group shall be solely responsible for all aspects of the diagnostic, clinical, therapeutic and related professional services delivered by the Providers, for establishing clinical policies and procedures for the Group and for the selection, training, professional direction, supervision and employment or engagement of all Providers.

2.2.2    Group hereby gives OI Infusion approval and authority to communicate with drug manufacturers and their representatives on behalf of the Group, for all matter related to drug procurement and administration of infusion services.

2.2.3    Group and OI Infusion retain joint control and decision making with regard to the execution of all administrative and non-clinical contracts related to the administration of infusion services at the Infusion Site including pricing and rebate arrangements, copay assistance programs, patient screening, and patient surveys. OI Infusion hereby acknowledges and agrees to update Group as to drug pricing on no less than a quarterly basis.

**2.3.    General Liability and Professional Liability Insurance.**

2.3.1    Group will obtain and maintain, at Group's cost, contractual liability insurance which extends to the obligations of Group under this Agreement with a minimum limit of one million dollars ($1,000,000) per occurrence, and three million dollars ($3,000,000) in the aggregate annually. Group shall cause insurer to give not less than ten

(10) days' notice prior to cancellation, termination or modification of such policies to OI Infusion. The terms of this section shall survive the termination of this Agreement.

2.3.2    Group will obtain and maintain, at Group's cost, during the entire term of this Agreement, general liability and professional liability insurance covering Group and its Providers, with a minimum limit of one million dollars ($1,000,000) per occurrence, and three million dollars ($3,000,000) in the aggregate annually, Group shall cause insurer to give not less than ten (10) days' notice prior to cancellation, termination or modification of such policies to OI Infusion. The general liability insurance shall provide coverage for any agents, employees, independent contractors or other persons furnished by OI Infusion to perform the Administrative Services under this Agreement and shall designate OI Infusion as a named insured. terms of this section shall survive the termination of this Agreement.

2.3.3    Group will obtain and maintain, at Group's cost, cyber insurance which extends to the obligations of Group under this Agreement with a minimum limit of one million dollars ($1,000,000) per occurrence, and three million dollars ($3,000,000) in the aggregate annually. Group shall cause insurer to give not less than ten (10) days' notice prior to cancellation, termination or modification of such policies to OI Infusion. The terms of this section shall survive the termination of this Agreement.

**Article 3**
**Reports, Audits and Access to Documentation**

3.1.    **Records.** OI Infusion shall maintain OI Infusion's books, records, and other documents necessary for the accurate and professional rendition of the Administrative Services for a period of six (6) years following termination of this Agreement, or such longer period as may be required by applicable law and regulation. Group, and any appropriate regulatory authority, including but not limited to, the DOH, the United States Department of Health and Human Services, and the United States Comptroller General, shall have the right to inspect OI Infusion's books and records as they relate to OI Infusion's processes, upon the provision of reasonable notice, during the regular business hours of OI Infusion. Group shall only be entitled to routine audits of OI Infusion's records and books related to the Services once per calendar year.

3.2.    **Patient Records.**

3.2.1    Group and its Providers shall maintain, in a timely manner, complete, accurate and legible records for all patients of Group ("Group Patients"), and all such records of Group Patients shall be the property of Group. Group and its Providers shall comply with all applicable laws, regulations and ethical principles concerning confidentiality of Group Patient records.

3.2.2    Group shall be responsible for determining the contents of Group Patient medical records with respect to Professional Services. Group shall grant OI Infusion access

to the information contained in the Group  Patient records to the extent that access to such information is permitted by law and is required in connection  with OI Infusion's Administrative Services.

3.2.3    As required by the privacy regulations issued under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Parties shall execute and comply with the terms of the Business Associate Addendum attached as **Exhibit 1** of this Agreement.

## Article 4
## Compensation

4.1.    **Administrative Fee.** For Administrative Services rendered pursuant to this Agreement, Group shall pay OI Infusion the administrative fees as set forth in Appendix B, which is attached hereto and incorporated herein by reference (collectively, the "Administrative Fees"). If Group fails to pay, Group may be subject to a late fee equal to one  percent (1.0%) per month or the maximum amount allowed by law, whichever is less.

4.2.    **Fair Market Value.** OI Infusion and Group agree that the fees set forth in this Article 5 and Appendix B have been  established with consideration for Group's use of OI Infusion's assets, systems, technology infrastructure, the  Administrative Services provided to Group, as well as the substantial commitment  and effort made by OI Infusion,  and that such fees have been negotiated at arms-length and are fair, reasonable, and consistent with fair market value.

## Article 5
## Term of Agreement

5.1.    **Term and Renewal.** This Agreement shall become effective _____, 2024 (the "Effective Date") and shall  remain in effect for a one (1) year term, unless sooner terminated as permitted under  this Article ("Initial Term").  Thereafter, this Agreement shall automatically renew for additional terms of one (1)  year each (each, a "Renewal Term"),  unless terminated as permitted under this Article.

5.2.    **Termination.** This Agreement may be terminated by either Party at the end of the Initial Term  or any Renewal Term  upon written notice provided to the other Party at least one hundred twenty (120) days in advance of the end of the Initial Term or  any Renewal Term.

5.3.    **Termination for Cause.** Notwithstanding the above, this Agreement may be terminated by either Party for cause  upon advance written notice to the other Party. For purposes of this Agreement, "cause" shall be deemed to exist:

(a)    immediately upon written notice by either Party if the other Party shall cease to operate or shall apply for,  consent to or request the appointment of a receiver, trustee, or

liquidator for a substantial part of its assets; file a voluntary petition in bankruptcy or is subject of any involuntary petition in bankruptcy which is not set aside within one hundred twenty (120) days of its filing; admit in writing its inability to pay its debts; file a petition or an answer seeking reorganization or arrangement with creditors; or take advantage of any insolvency law; or

(b)      upon the breach of a material duty or obligation hereunder by the other Party provided, however, the non-breaching Party shall give thirty (30) days' advance written notice to the breaching Party identifying the alleged default or breach and the breaching Party shall have thirty (30) days to cure such default or breach, if possible.

5.4.      **Termination Upon Group Sale or Merger.** Either Party may terminate this Agreement immediately upon the merger, consolidation, reorganization, sale, liquidation, dissolution, or other disposition of all or substantially all of the membership interests or assets or stock of Group.

5.5.      **Termination for No Cause.** At any point after the Initial Term, either Party may terminate this Agreement for no reason whatsoever upon 120 days' advance written notice to the other Party.

5.6.      **Rights and Obligations After Termination.** Upon termination or expiration of this Agreement by either Party, Group shall pay OI Infusion any Administrative Fees owed to OI Infusion within thirty (30) days of the date of termination or expiration. Upon termination or expiration of this Agreement, Group shall return to OI Infusion any and all property of OI Infusion that may be in Group's possession or under Group's control, but that is not owned by a third party (i.e. hospital where Group provides emergency medical services).

<u>**Article 6**</u>
<u>**Indemnification**</u>

**Indemnification.** Each of the Parties hereto shall indemnify the other Party and hold each other harmless against any and all claims, actions, assessments, charges, and expenses, including court costs and reasonable attorneys' fees, and against all liabilities, losses, damages of any nature and settlements, judgments, or awards, whether compensatory, extra contractual, or punitive, that a Party shall sustain or be put to by reason of any act or omission of the other Party during the course of this Agreement or any breach by the other Party of the terms of this Agreement, except for claims, losses, damages or expenses that are solely the result of the negligence or willful misconduct of the Party seeking indemnification (collectively, "Damages"). This section shall continue to be in full force and effect, notwithstanding the termination of this Agreement, until all claims and liabilities related to Damages have been asserted, satisfied and released.

## Article 7
## Confidentiality and Intellectual Property Provisions and Other Covenants

**7.1.   Confidentiality.**

7.1.1   Group recognizes and acknowledges that this Agreement and all records, files (excluding patient files that are owned by Group), reports, protocols, policies, manuals, data bases, processes, procedures, computer systems,  materials and other documents provided by OI Infusion (or its affiliates) in rendering services hereunder, or relating to the operations of OI Infusion (or its affiliates), belong to and shall remain the property of OI  Infusion, and constitute proprietary information and trade secrets that are valuable, special, and unique assets  of OI Infusion's business ("OI Infusion Confidential Information").

7.1.2   Group shall exercise the same degree of care to protect such OI Infusion Confidential Information of OI  Infusion as it takes with its own information, including advising its employees who receive OI Infusion  Confidential Information of the existence and terms of this Agreement and of the obligations of  confidentiality herein.

7.1.3   OI Infusion recognizes and acknowledges that all records, files, contracts, patient information, trade secrets of Group or the manner in which it performs its operations belong to and shall remain the property of Group and constitute proprietary information and trade secrets that are valuable, special, and unique assets of Group's business.

7.1.4   Nothing in this Agreement shall  be construed or interpreted to create or convey any ownership rights, license,  title, or permission  for either Party to use the other Parties' Confidential Information whether or not such information is copyrighted, patented, or otherwise protected, for purposes other than as contained in this Agreement.

**7.2.     OI Infusion Use of Data.**  OI Infusion may incorporate claims and outcomes data into OI Infusion's databases for OI Infusion's use  in accordance with the terms of this Agreement.

**7.3.   Intellectual Property.**

7.3.1   OI Infusion Confidential Information and any and all works, discoveries and developments, whether or not  copyrightable, relating to OI Infusion's present, past or prospective activities, services and products ("Inventions") that are at any time conceived or reduced to practice by Group and/or any of its Providers,  acting alone or in conjunction with others, in connection with OI Infusion's provision of Administrative  Services or, during the course of Group's employment or engagement of Providers (or, if based on or related  to any Confidential Information, made by Group and/or any Provider during or after the term of this  Agreement  or employment  or engagement  by Group) and all concepts and ideas developed by Group  or any Provider at any time during the term of this

Agreement (and, as to a Provider, at any time during the term of this Agreement while the Provider is employed or engaged by Group) and that relate to OI Infusion's present, past or prospective activities, services and products ("Concepts and Ideas") or any modifications thereof held by or known to Group and/or any Provider on the date of this Agreement or acquired by Group and/or any Provider during the term of this Agreement shall be the property of OI Infusion, free of any reserved or other rights of any kind by Group and/or any Provider's in respect thereof.

**7.4.    Other Covenants.**

7.4.1    *Non-Solicitation.* To the extent permitted by law, Parties shall not, during the term of this Agreement and for a period of two (2) years from the date of termination or expiration of this Agreement, solicit for employment, verbally or in writing, employ or offer employment to any employee or former employee of the other Party.

7.4.2    *Exclusive Administrative Services Contractor.* Except as expressly provided in this Agreement or with the prior written consent of OI Infusion, (i) OI Infusion shall be the exclusive provider to Group of such Administrative Services in conjunction with Group, and (ii) Group shall not obtain any Administrative Services from any source other than OI Infusion or itself.

**7.5.    Enforcement.** The Parties agree that the restrictive covenants set forth in this Article are reasonable in nature, duration and geographical scope. The Parties further acknowledge that any violation of those restrictive covenants will cause irreparable damage, which a monetary award would be inadequate to remedy, and that a court or arbitrator of competent jurisdiction may, in addition to monetary awards, enjoin any breach of, and enforce, such restrictive covenants by temporary restraining order, and preliminary and permanent injunctive relief without the need to post any bond or surety. If a court or arbitrator of competent jurisdiction determines that any of the restrictive covenants set forth in this Article are unreasonable in nature, duration or geographic scope, the Parties agree that such court or arbitrator shall reform such restrictive covenant so that such restrictive covenant is enforceable to the maximum extent permitted by law for a restrictive covenant of that nature, and such court shall enforce the restrictive covenant to that extent. If any court or arbitrator finds that either Party has breached any restrictive covenants set forth in this Article, then such restrictive covenants shall be extended for an additional period equal to the period of such breach.

**Article 8**
**<u>Miscellaneous</u>**

8.1.    **Notices.** All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, sent by overnight delivery service such as FedEx, or mailed by registered or certified mail return receipt requested with first class postage

prepaid to the address set forth on the signature page or such other address as the Parties may request by notice provided pursuant to this Section. A notice sent as provided herein shall be deemed to have been received on the day given if personally delivered or, if mailed, on the fifth business day following the date on which such notice was mailed.

8.2.    **Sole and Entire Agreement.**  This Agreement is the sole agreement between OI Infusion and Group regarding providing administrative services to Group and the compensation to be paid to OI Infusion for such administrative services. No amendment or alteration or modification of this Agreement shall be effective unless set forth in writing and executed by each Party. Notwithstanding the foregoing, the Parties may amend the Agreement upon written notice and mutually written agreement.  This Agreement, together with its Appendices and Exhibits, constitutes the entire understanding of the Parties with respect to the subject matter hereof, and supersedes any prior agreements, promises, negotiations or representations, whether written or oral, related to the subject matter of the Agreement that are not expressly set forth herein.

8.3.    **No Waiver.**  Neither the failure by an aggrieved Party to this Agreement to insist upon strict performance of any term or condition of this Agreement or to exercise any remedy as a consequence upon a breach thereof, nor the acceptance of full or partial performance during the continuance of any breach by the other Party, shall constitute a waiver of any such breach or of such term or condition.

8.4.    **No Third Party Beneficiaries.**  Each of the provisions of this Agreement is for the sole and exclusive benefit of the Parties hereto, respectively, as their interests shall appear, and shall not be deemed to be for the benefit of any other person or entity or group of persons or entities.

8.5.    **Assignment.**  This Agreement may be assigned by either Party without the consent of the other Party to a partnership, corporation, or other entity that controls, is controlled by, or is under common control of the named Party to another partnership, corporation, or entity that is, concurrently with such assignment, succeeding to substantially all of the equity or assets and liabilities of the assigning Party.

8.6.    **Partial Invalidity.**  In the event that any term or provision of this Agreement shall to any extent be held by a court of proper jurisdiction to be invalid or unenforceable for any reason, the remainder of this Agreement shall not be affected thereby, and the remaining terms and provisions hereof shall remain in full force and effect. The invalid or unenforceable provisions shall, to the extent permitted by law, be deemed and given such interpretation as will achieve as nearly as possible the intent of this Agreement.

8.7.    **Governing Law.** This Agreement shall be governed by and construed under the laws of the State of Maryland, without reference to such State's choice of law or conflict of laws provisions.

8.8.    **Construction.**  The headings contained in this Agreement have been inserted for the

convenience of reference only and shall in no way restrict or modify any of the terms or provisions hereof. Group and OI Infusion have participated jointly in the negotiation of this Agreement, and each has had the advice of legal counsel to review, comment upon, and draft this Agreement. Accordingly, it is agreed that no rule of construction shall apply against any Party or in favor of any Party, and any uncertainty or ambiguity shall not be interpreted against any one Party and in favor of the other.

8.9. **Independent Contractors.** The Parties are independent contractors and separate legal entities, which are not responsible for the acts or omissions of the other. The relationship between the Parties is reflected in this Agreement, and neither the Parties, nor the employees, servants, agents, nor representatives of either shall be considered the employee, servant, agent, or representative of the other. None of the provisions of this Agreement are intended to create or to be construed as creating any agency, partnership, joint venture, or employer-employee relationship between or among the Parties or any of their respective employees, servants, agents or representatives.

8.10. **Force Majeure.** Neither Party shall be liable for nor deemed to be in default for any delay or failure to perform under this Agreement deemed to result, directly or indirectly, from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquake, flood, failure of transportation, strikes, pandemics, public health emergencies, State or Federal mandated shutdowns, or other work interruptions by either Party's employees or any other cause beyond the reasonable control of either Party. For purposes of this Agreement, the Parties hereby acknowledge and agree that they can only be excused from specific performance under this Agreement as set forth in this Section for no longer than is actually substantiated by the Party seeking excuse and agreed to by the excusing Party.

8.11. **Notification of Legal Matters.** If any action is instituted against either Party relating to this Agreement or any services provided hereunder, or in the event such Party becomes aware of facts or circumstances which reasonably indicate possibility of litigation with any Provider, employer, any Covered Individual under the Health Insurance Portability and Accountability Act of 1996, or any other third person or entity relevant to the rights, obligations, or responsibilities or duties such Party under this Agreement, such Party shall provide timely notice to the other, and the other Party shall cooperate with the first Party in connection with the defense of any such action by furnishing such material or information as is in the possession and control of the other Party relevant to such action.

8.12. **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

8.13. **Tax.** Any applicable sales, use, or other similarly assessed and administered tax imposed on services provided hereunder, will be the sole responsibility of Group. If OI Infusion is legally

obligated to collect and remit sales, use, or other similarly assessed and administered tax in a particular jurisdiction, the tax will be reflected on the applicable invoice or subsequently invoiced at such time as OI Infusion becomes aware of such obligation.

*{SIGNATURE PAGE TO FOLLOW}*

IN WITNESS WHEREOF, the Parties hereto have entered into this Agreement as of the date written below.

**OI INFUSION**

OI INFUSION SERVICES, LLC

By:_____
Name:  Joseph Brunink
Title: Chief Executive Officer

**GROUP:**

MID-ATLANTIC RHEUMATOLOGY, LLC

By:_____
Name: Erinn Maury, M.D.
Title: President

**Appendix A**
**ADMINISTRATIVE SERVICES**

Group and OI Infusion agree that OI Infusion shall perform, or arrange for the performance of, the Administrative Services set forth in this Appendix A:

1. <u>General Responsibilities of OI Infusion.</u> OI Infusion shall have responsibility for general administration of the day-to-day business operations of Group's infusion clinic, exclusive of the in-office infusion therapy, and shall include the following set forth in this Section.

1.1.1. OI Infusion shall provide or arrange for the provision of the Administrative Services as described below related to the in-office infusion business only.  OI Infusion is authorized to perform its services it deems necessary to meet the day-to-day requirements of Group in accordance with this Agreement, including performance of some business office functions at or by domestic locations other than the premises of Group and by persons other than employees of OI Infusion. These services and functions specifically include services related to electronic medical records, billing, and insurance verification.  To this end and for these purposes, OI Infusion is authorized to contract with d o m e s t i c  third parties, including one or more of its affiliates, for the provision of the aforesaid services, equipment, and personnel needed to perform its obligations under this Agreement. Any contracts with such domestic affiliates shall be arms' length agreements on terms reasonably available from reasonably efficient competing vendors.  The Parties acknowledge and agree that OI Infusion is not explicitly or implicitly authorized under this Agreement to contract or arrange for any other such functions or services not specifically enumerated in this Agreement to be provided to OI Infusion for the benefit of Group or for Group directly without notice to / agreement by Group.

1.2. The Administrative Services to be provided by OI Infusion for Group and/or its affiliated entities shall include the following separate and distinct types of services, as applicable:

1.2.1. General administrative services including business and strategic planning and limited financial services related to infusion services including (i) the preparation of annual financial statements for Group, (ii) providing to Group the data necessary for Group to prepare and file its own tax returns, and (iii) generating monthly reports summarizing gross billings, collections, write-offs, and insurance disputes within ten (10) days at the end of each month.

1.2.2. Providing or arranging for the provision of nurses to the Infusion Site, all of whom shall be hired and employed by Group. OI Infusion will recruit, train, and manage nurses, and provide all non-clinical nursing oversight as necessary to staff the Infusion Site. The management of the nurses shall be in conjunction with Group.  OI Infusion will screen all infusion nurses that are recruited for the Infusion Site based upon experience and skills in intravenous therapy, as well as level of compassion for bettering the lives of patients. As the employer, Group will assess the clinical competency and proficiency of each nurse recruited

by OI Infusion and shall be responsible for all final decisions related to the selection, retention, management, and dismissal of nurses assigned to the Infusion Site.

12.3.  Data processing services, maintenance of patient records established in OI Infusions data base in accordance with procedures established by Group, administering or causing to be administered any welfare, benefit, or insurance plan or arrangement of Group, and human resources management, including primary direction and control of recruitment, training, and management of all administrative staff at the Infusion Site. The management and control of administrative staff at the Infusion Site shall be jointly performed in conjunction with Group as the employer of staff.

12.4.  Purchasing and maintaining furnishings and equipment including asset and materials management, purchase and stocking of office supplies, and maintenance of equipment and facilities, subject to Group 's approval of the selection of medical equipment for Group.

12.5.  Billing and coding services including establishing and maintaining credit, billing, and collection policies and procedures to include the timely coding of each patient encounter with the appropriate service and diagnostic codes; billing and collecting all professional and other fees for all billable services provided by Group; billing Group's patients and third-party payors on Group's behalf; collecting and receiving in Group's name and on Group's behalf all accounts receivable generated by such bills and claims for reimbursement or indemnification; depositing all amounts collected into Group's account; providing Group with monthly reports summarizing gross billings, collections, write-offs, and insurance disputes within ten (10) days at the end of each month; and maintaining the professional calendar, scheduling, and rotation services.

12.6.  Inventory purchasing and management and management of relationships with pharmaceutical vendors.

**Appendix B**
**COMPENSATION**

In exchange for the Services provided pursuant to this Agreement, Group shall (1) pay an administrative fee (the "Administrative Fee") to OI Infusion, (2) reimburse OI Infusion for all Infusion Site Expenses (defined below), and (3) reimburse OI Infusion for all approved start-up costs, on a timely basis, pursuant to this Appendix B.

OI Infusion shall calculate Drug Expenses, Staffing Expenses, Supplies Expenses, and Technology Expenses (collectively, the "Infusion Site Expenses") and Net Earnings of Group in accordance with the following methodology:

1. First, OI Infusion shall calculate the cost of all drugs purchased for use in operation of the Infusion Site ordered by the Infusion Site (the "Drug Expenses"), subject to the following terms:
   a. The Drug Expenses shall exclude the cost of any drugs for which a claim for payment to Group is uncollected due to a denial rooted in failure to obtain pre-authorization or timely filing related to collection services that OI Infusion was responsible for providing.
   b. The Parties agree that OI Infusion will be entitled to retain prompt payment rebates and other administrative rebates as provided for under the applicable distributor, group purchase or wholesale product purchase agreements.
   c. The Parties agree that Group will be entitled to provider rebates as provided for under the applicable distributor, group purchase or wholesale product purchase agreements.
   d. Drug Expenses shall be reconciled by Group and OI Infusion on a weekly basis, and OI Infusion shall invoice Group on a weekly basis for those Drug Expenses where reimbursement has been collected by Group. Group is responsible for remitting payment for those invoices according to payment terms outlined below.
   e. OI Infusion shall promptly communicate the costs of the drugs on no less than a quarterly basis.
2. Second, OI Infusion shall calculate the total costs and expenses incurred by OI Infusion on behalf of Group related to OI Infusion's provision of nursing services or staffing directly to Group including, without limitation, any compensation, benefits and payroll taxes and related employer related withholdings and costs ("Staffing Expenses").
   a. For all nursing services, "Staffing Expenses" shall only include fifty percent (50%) of the total costs and expenses incurred by OI Infusion related to the provision of such nursing services.
3. Third, OI Infusion shall calculate the total costs and expenses incurred by OI Infusion related to any supplies and equipment procured on behalf of Group and technology services provided by OI Infusion to Group ("Supplies and Technology Expenses").
4. Fourth, the total Infusion Site Expenses (as calculated above) shall be *subtracted from* the Revenue (defined below) of Group ("Net Earnings"). "Revenue" shall mean all revenue generated by the Group each month on an accrual basis as recognized on the books and records kept by OI Infusion.

Once the foregoing has been calculated, Group shall pay to OI Infusion the following on a monthly

basis:

1. An Administrative Fee calculated as follows:
   a. Group shall pay to OI Infusion a fee, in exchange for direct expenses of the Infusion Site, equal to forty percent (40%) of all payments actually received by the Group from third-party payors in a given calendar month related to drugs used in operation of the Infusion Site ordered by the Infusion Site and the provision of professional services by the Infusion; and
   b. Group shall pay to OI Infusion a fee ("OI Management Fee") equal to the Net Earnings multiplied by two percent (2%).
2. In addition to the foregoing, Group shall reimburse OI Infusion for (a) all Infusion Site Expenses on a monthly basis, and (b) accrued start-up costs related to the management of an Infusion Site, approved in advance by the Group.

In the event the Group's reimbursement is not sufficient to fully cover OI Infusion's invoices for its services provided hereunder, Group shall pay for those invoices, in a timely manner and in accordance with the payment terms outlined below, when sufficient reimbursement has been collected.

All fees payable pursuant to this Agreement shall be payable within ten (10) days of receipt by the Group of a monthly invoice from OI Infusion. If Group fails to pay invoice when due, Group may be subject to a late fee equal to one percent (1.0%) of the amount outstanding per month or the maximum amount allowed by law, whichever is less.

**Exhibit 1**
**Business Associate Agreement HIPAA**

**<u>BUSINESS ASSOCIATE AGREEMENT</u>**

This BUSINESS ASSOCIATE AGREEMENT is entered this _____ day of _____, 2024, between **Mid-Atlantic Rheumatology, LLC** and **OI Infusion Services, LLC**, which Parties have contemporaneously entered into a Administrative Services Agreement (the "Services Agreement").

The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required by Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use.

<u>Specific definitions</u>:

(a) <u>Business Associate</u>. "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the Party to this agreement, shall mean OI Infusion Services, LLC.

(b) <u>Covered Entity</u>. "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the Party to this agreement, shall mean Mid-Atlantic Rheumatology, LLC.

(c) <u>HIPAA Rules</u>. "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

**Obligations and Activities of Business Associate**

<u>Business Associate agrees to</u>:

(a) Not use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

(b) Use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

(c) Report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware;

(d) In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

(e) Make available protected health information in a designated record set to the covered entity as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

(f) Make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

(g) Maintain and make available the information required to provide an accounting of disclosures to the covered entity as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

(h) To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

(i) Make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

**Permitted Uses and Disclosures by Business Associate**

(a) Business associate may only use or disclose protected health information as necessary to perform the services set forth in Service Agreement.

(b) Business associate may use or disclose protected health information as required by law.

(c) Business associate agrees to make uses and disclosures and requests for protected health information consistent with covered entity's minimum necessary policies and procedures.

(d) Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

(e) Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

(f) Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

**Permissible Requests by Covered Entity**

Covered entity shall not request business associate to use or disclose protected health information in any manner that would not be permissible under Subpart E of 45 CFR Part 164 if done by covered entity.

**Term and Termination**

(a) <u>Term</u>. The Term of this Agreement shall be effective as of the effective date of the Services Agreement and shall terminate on the termination date of the Services Agreement.

(b) <u>Obligations of Business Associate Upon Termination</u>. Upon termination of this Agreement for any reason, business associate shall return to covered entity or, if agreed to by covered entity, destroy all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form. Business associate shall retain no copies of the protected health information. Should business associate conclude that returning or destroying any PHI is not feasible, business associate shall extend the protections of this Agreement to such PHI and shall limit its further uses and disclosures to those purposes that necessitate business associate continuing to maintain this PHI.

(c) <u>Survival</u>. The obligations of business associate under this Section shall survive the termination of this Agreement.

**Miscellaneous**

(a) <u>Regulatory References</u>. A reference in this Agreement to a section in the HIPAA Rules means the section as in effect or as amended.

(b) <u>Amendment</u>. The Parties agree to take such action as is necessary to amend this Agreement from time to time as is necessary for compliance with the requirements of the HIPAA Rules and any other applicable law.

(c) <u>Interpretation</u>. Any ambiguity in this Agreement shall be interpreted to permit compliance with the HIPAA Rules.

(d)  This Agreement shall be governed by the laws of the State of Maryland, and the venue and exclusive jurisdiction over any legal disputes between the Parties arising under this Agreement shall be in the State and Federal courts of the State of Maryland.

(e)  Should any provision of this Agreement be held invalid or unenforceable by a court of competent jurisdiction, the remaining provisions will continue in full force and effect.

(f)  This Agreement is the entire agreement of the Parties related to its subject matter and supersedes all prior agreements, both written and oral, between the Parties, related thereto.

BUSINESS ASSOCIATE                          COVERED ENTITY



_____          _____
OI Infusion Services, LLC                        Mid-Atlantic Rheumatology
By: Joseph Brunink, Chief Executive Officer        By:  Erinn Maury, M.D., Owner

**FIRST AMENDMENT TO
ADMINISTRATIVE SERVICES AGREEMENT**

**THIS FIRST AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT** (the "*Amendment*") is entered into ___December 31st,__ 2024 (the "*Amendment Effective Date*"), by and between **Mid-Atlantic Rheumatology, LLC**, a Maryland limited liability company ("*Group*"), and **OI Infusion Services, LLC**, a Delaware limited liability company ("*OI Infusion*"). Group and OI Infusion are sometimes referred to collectively herein as the "*Parties*".

**RECITALS**

**WHEREAS**, Group and OI Infusion entered into that certain Administrative Services Agreement, dated July 12, 2024 (the "*Agreement*"), setting forth the terms and conditions of Group's engagement of OI Infusion to provide certain non-clinical administrative services required by Group to operate Group's Infusion Site;

**WHEREAS**, the Parties desire to amend the Agreement, effective as of the Amendment Effective Date, to (1) reflect the parties agreement with respect to OI Infusion providing or arranging for the provision of nurses to the Infusion Site, and (2) correct a scriveners error with respect to the Administrative Fees paid by Group to OI Infusion, as set forth herein; and

**WHEREAS**, capitalized terms not defined herein shall have the meaning ascribed to them in the Agreement.

**NOW THEREFORE**, in consideration of the foregoing recitals and the mutual promises and conditions set forth herein, Group and OI Infusion agree as follows:

A. **Amendment to the Agreement**.

1.      Amendment to Appendix A (Administrative Services).  Section 1.2.2 of Appendix A (Administrative Services) of the Agreement is hereby deleted in its entirety and replaced with the following:

1.2.2.          Providing, or arrange for the provision of, nurses to the Infusion Site. OI Infusion will recruit, train, and manage nurses, and provide all non-clinical nursing oversight as necessary to staff the Infusion Site. OI Infusion will screen all infusion nurses that are recruited for the Infusion Site based upon experience and skills in intravenous therapy, as well as level of compassion for bettering the lives of patients. Group will assess the clinical competency and proficiency of each nurse recruited by OI Infusion and shall be responsible for all final decisions related to the selection, retention, and dismissal of nurses assigned to the Infusion Site.

2.      Amendment to Appendix B (Compensation):  Section 1 of the third paragraph of Appendix B (Compensation) in the Agreement is hereby deleted in its entirety and replaced with the following:

25170992 v1

Once the foregoing has been calculated, Group shall pay to OI Infusion the following on a monthly basis:

1.  An Administrative Fee calculated as follows:

    a.  Group shall pay to OI Infusion a fee, in exchange for direct expenses of the Infusion Site, equal to two percent (2%) of all payments actually received by the Group from third-party payors in a given calendar month related to drugs used in operation of the Infusion Site ordered by the Infusion Site and the provision of professional services by the Infusion; and

    b.  Group shall pay to OI Infusion a fee ("OI Management Fee") equal to the Net Earnings multiplied by forty percent (40%).

**B.  Miscellaneous Provisions**.

1.  Capitalized Terms.  All capitalized terms in this Amendment shall have the same meaning given to such terms in the Agreement unless otherwise specified in this Amendment.

2.  Continuation of Agreement.  Except as specifically amended pursuant to the foregoing, the Agreement shall continue in full force and effect in accordance with the terms in existence as of the date of this Amendment.  After the date of this Amendment, any reference to the Agreement shall mean the Agreement as amended by this Amendment.

3.  Choice of Law.  This Amendment shall be governed by and shall be construed in accordance with the laws of the State of Maryland.

4.  Recitals.  The recitals set forth above are incorporated herein by reference as reflecting the general understanding and intent of the Parties.

5.  Counterparts.  This Amendment may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Amendment and all of which, when taken together, will be deemed to constitute one and the same agreement.  Delivery of an executed counterpart of this Amendment by facsimile or other electronic imaging means shall be effective as an original.

*[Signature page to follow]*

2

25170992 v1

**IN WITNESS WHEREOF**, OI Infusion and Group, by their duly authorized representatives, have executed this Amendment.

**GROUP**

Signature: _____

Name: Brian Liebknecht

Title: Chief Executive Officer

Date: November 25, 2024 _____

**OI INFUSION**

Signature:_____

Name: Joseph Brunink

Title: Chief Executive Officer

Date:___ 11/25/2024 _____

25170992 v1